841 F.2d 70
 ATLANTIC TELE-NETWORK CO., a V.I. Corp.
v.
The PUBLIC SERVICES COMMISSION OF the VIRGIN ISLANDS,
Patrick M. Rice, Executive Director of the Public
Services Commission, Appellants.
 No. 87-3485.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 9, 1987.
Decided March 10, 1988.
 
 Nicholas W. Fels, Paul J. Berman, Alan Tawshunsky, Covington & Burling, Washington, D.C., Winston A. Hodge, Albert A. Sheen (argued), Winston A. Hodge, P.C., Christiansted, St. Croix, U.S. Virgin Islands, for appellee.
 Maria Tankenson Hodge (argued), Maria Tankenson Hodge, P.C., St. Thomas, V.I., for appellants.
 Before GIBBONS, Chief Judge, and STAPLETON and MANSMANN, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 Atlantic Tele-Network Company (ATN) here challenges the authority of the Public Service Commission of the Virgin Islands (PSC) to regulate the sale of the stock of the Virgin Islands Telephone Corporation (Vitelco) to ATN. The district court held that the PSC did not have authority to impose conditions on the sale under its original enabling statute and that the application to this sale of a statutory amendment explicitly granting such authority would violate the Contract Clause. Because we find that the statute prior to its amendment gave the PSC the authority to impose the disputed conditions, we will reverse.
 
 I.
 
 2
 Vitelco is the sole telephone company in the Virgin Islands. It was created in 1959 as a wholly owned subsidiary of the International Telephone and Telegraph Company (ITT) pursuant to an agreement between the Government of the Virgin Islands and ITT. The 1959 agreement prohibited the transfer of Vitelco's stock for a period of five years,[1] and required Vitelco to sign a franchise agreement that included a prohibition against transfer of the franchise without the consent of the PSC.
 
 
 3
 On January 9, 1987, ITT entered a Stock Purchase and Sale Agreement in which it agreed to sell all the shares of Vitelco's capital stock to ATN, a corporation that had been formed by a group of investors for the purpose of acquiring and controlling Vitelco.
 
 
 4
 The PSC learned of this agreement and attempted to exercise its regulatory authority over Vitelco by imposing conditions on the terms of the stock sale. The PSC held several hearings beginning in January, 1987, and entered several orders setting forth its conditions for approving the sale. ATN decided to participate voluntarily in all of the PSC proceedings and attempted to accommodate the PSC's concerns by modifying the agreement. ATN maintained throughout, however, that the PSC had no power to disapprove the sale or impose conditions.
 
 
 5
 On April 23, 1987, following its fourth hearing on the matter, the PSC issued the order contested in this case, No. 22-1987. In this order, the PSC concluded that certain terms of the sale relating to financing threatened the economic viability of Vitelco, and directed that the sale not be consummated unless certain conditions were satisfied. The primary difficulty identified by the PSC was that of a purchase price of approximately $98 million, ATN was to put up only $15.5 million in equity and borrow the remaining $82.5 million from its principal stockholder using the assets of Vitelco as collateral.
 
 
 6
 In order to insure that ATN would be able to pay its indebtedness to its principal stockholder, the agreement of sale called for the imposition of several restrictions on Vitelco. First, there was to be a "negative pledge of assets," under which Vitelco, for the duration of ATN's loan, would be foreclosed from pledging any of its assets to obtain additional capital, with the sole exception that Vitelco could execute purchase money mortgages in connection with purchases of new equipment. Second, for the duration of the loan, Vitelco was to take no action that would restrict Vitelco's ability to pay dividends to ATN. These restrictions led the PSC to conclude that
 
 
 7
 inasmuch as Vitelco will be ATN's sole source of repayment of its $80 million debt, as well as its mandatory 12% annual dividend to preferred shareholders, there will be an unavoidable financial harm to Vitelco, including an immediate negative effect on retained earnings, and a negative cash flow by 1994, with a consequent upsurge in pressure to sacrifice reasonable capital investment requirements and prudent maintenance and operation expense obligations. Further, since the Vitelco stock is pledged as security for the debt, default would result in a chaotic situation for the utility.
 
 
 8
 App. at A-100. The PSC ordered that the sale not take place unless the negative pledge of assets and the restriction on dividends were removed. The PSC also required that ATN's principal stockholder provide Vitelco with a $15 million irrevocable letter of credit, and stated several other conditions of its approval.
 
 
 9
 On May 18, 1987 the Virgin Islands legislature enacted Act No. 5258, which was signed into law the next day. This statute provides:
 
 
 10
 No person or corporation, whether or not organized under the laws of the Territory, shall sell, acquire or transfer control, either directly, or indirectly of any public utility organized and doing business in this territory, without first securing authorization from the commission. Any such acquisition or control without prior authorization shall be void and of no effect.
 
 
 11
 Act No. 5258, Sec. 1(a) (May 18, 1987) (to be codified at 30 V.I.C. Sec. 43a), reprinted in App. at A-130.
 
 
 12
 Five days later, ATN filed a petition for reconsideration of the PSC's April 23rd order under 30 V.I.C. Sec. 33 (1976). The PSC scheduled a hearing on this petition, but before the hearing could be held, ATN filed this suit in the District Court of the Virgin Islands on June 2, 1987. ATN sought declaratory and injunctive relief against interference by the PSC with ATN's purchase of Vitelco's stock. The district court granted ATN's summary judgment motion. This appeal followed.
 
 
 13
 We have jurisdiction under 28 U.S.C. Sec. 1291 (1982). Our review of the district court's determination regarding the PSC's authority to regulate the sale of Vitelco's stock is plenary.[2]II.
 
 
 14
 Vitelco is a public utility. 30 V.I.C. Sec. 1(a)(3)(1976). As a public utility, Vitelco "is required [by the Public Utilities Act] to furnish service and facilities reasonably safe and adequate and in all respects just and reasonable." 30 V.I.C. Sec. 2 (1976).
 
 
 15
 Under the Act, the PSC has broad authority to regulate public utilities. In particular, the PSC has
 
 
 16
 the power, after hearing and notice by order in writing, to require and compel every public utility to comply with the provisions of this chapter, and with all other laws of the Virgin Islands applicable, and any ordinance or regulation relating to said public utility, and to conform to the duties upon it thereby imposed or by the provisions of its own charter, if any charter has or shall be granted it.
 
 
 17
 30 V.I.C. Sec. 4 (1976). In addition to granting the PSC these explicit powers, the statute also states:
 
 
 18
 The provisions of this chapter shall be interpreted and construed liberally in order to accomplish the purposes thereof, and where any specific power or authority is given the Commission by the provisions of this chapter the enumeration thereof shall not be held to exclude or impair any power or authority otherwise in this chapter conferred on said Commission. The Commission hereby created shall have, in addition to the powers in this chapter specified, mentioned, and indicated all additional, implied, and incidental power which may be proper and necessary to effect and carry out, perform and execute all the said powers herein specified, mentioned, and indicated.
 
 
 19
 30 V.I.C. Sec. 41 (1976) (emphasis added).
 
 
 20
 Although no statutory provision enacted before the May, 1987 amendment explicitly gives the PSC the power to regulate the sale of a utility's stock, this power must be inferred from the pre-amendment statutory scheme. The PSC is charged with the responsibility of seeing that a utility meets its statutory obligation to provide adequate facilities and service at reasonable rates. In order to fulfill this responsibility, the PSC must have the authority to require a utility to maintain the kind of financial stability that will enable it to continue providing adequate facilities and service at reasonable rates in the future. In particular, if a sale of a utility's stock is proposed on terms that the PSC concludes will deprive the utility of such financial stability, it must be able to act effectively or its statutory mandate will go unfulfilled.
 
 
 21
 In Vitelco's case, the PSC in its April 23rd Order found that under the terms of the sale of Vitelco's stock to ATN, Vitelco is required to engage in conduct that will jeopardize its ability to provide adequate facilities and service at reasonable rates in the future. Once the PSC made such a finding, it had broad remedial powers to compel Vitelco to conform to its statutory duty. Although the district court held that the sale of Vitelco's stock on the proposed terms would not directly and immediately affect rates and services, we do not believe the Virgin Islands legislature intended that the PSC would have to wait until disaster struck before taking remedial action.
 
 
 22
 ATN argues that the PSC's order attempts to regulate not Vitelco, but ATN and ITT, which are not public utilities. Although we agree that the PSC has no authority to regulate the conduct of ATN or ITT per se, we conclude that it clearly has the authority to regulate what they can extract from or impose upon Vitelco. If we were to accept ATN's position that the PSC has no authority with respect to the sale of Vitelco's stock, it would necessarily follow that the PSC is powerless to stop ATN from causing Vitelco to place securities in the market containing covenants with unreasonable restrictions on Vitelco's use of its assets. We conclude that the PSC's powers are not so constrained.
 
 
 23
 In addition, ATN contends that the five year prohibition on the transfer of control of Vitelco's stock contained in the 1959 agreement evidences the legislature's intent not to allow the PSC to interfere with any stock transfers after that time. Suffice it to say that we do not read that agreement as conferring upon ITT an unfettered right to sell Vitelco at the end of the five year period without regard to the effect of the transfer on Vitelco's ability to offer adequate telephone facilities and service at reasonable rates.
 
 III.
 
 24
 We hold that the PSC had authority under the pre-amendment statute to impose conditions on the sale of Vitelco's stock as a means of assuring Vitelco's continuing ability to provide adequate facilities and service at reasonable rates. In light of this holding, we need not decide whether the application of the statutory amendment to this sale would violate the Contract Clause.[3] We will reverse the judgment of the district court and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 The provision stated:
 That, for a period of at least five (5) years from the date of such assignment, [ITT] will not relinquish majority stock control of [Vitelco], and [Vitelco], by its acceptance of the assignment of this agreement warrants that it will not, within the said five year period, sell its capital stock in such manner as to transfer stock control to any party other than [ITT].
 App. at A-311 p 1(d).
 
 
 [2]
 After the district court's decision, the purchase of Vitelco's stock by ATN was consummated. ATN then moved to dismiss on the ground that the case is now moot. The relevant question in mootness analysis is whether in light of changed circumstances the court can afford meaningful relief. See Jersey Cent. Power & Light Co. v. Township of Lacey, 772 F.2d 1103, 1108 (3d Cir.1985), cert. denied, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986); Natural Resources Defense Council, Inc. v. United States EPA, 683 F.2d 752, 759 (3d Cir.1982) (relevant mootness analysis is whether the "court could order relief in this case which would cure an injury which would otherwise continue to exist")
 In this case, the court can afford meaningful relief by reversing because the PSC would then have the authority to impose fines for a violation of its order and perhaps to seek rescission of the contract. See 30 V.I.C. Sec. 39 (1976). Although the PSC could choose not to seek these remedies, its right to consider them in subsequent proceedings makes this controversy a live one.
 This case is controlled by this court's decision in Jersey Central Power & Light. In that case, a utility company brought suit to declare unconstitutional a town's ordinance prohibiting the importation of nuclear waste into the town for the purpose of storage there. The district court declared the ordinance unconstitutional and enjoined its enforcement, and the town appealed. While the appeal was pending, the utility company placed nuclear waste in a storage facility in the town. The court of appeals held that the case was not moot on two separate grounds. First, the court noted that the district court's injunction allowed storage as well as importation. The court then reasoned that, because the storage continued, if the court reversed the town could get an injunction requiring the removal of the nuclear waste. Second, the court noted that the town could impose fines on the utility company under the ordinance if the court reversed. Jersey Central Power & Light supports the PSC's position since, like the town in that case, the PSC could seek to impose fines or to rescind the sale if the judgment of the district court is reversed.
 
 
 [3]
 In addition, given the fact that the PSC has not had an opportunity to take a position on the form its final order will take, we need not decide whether all aspects of the April 23 order fall within the authority of the PSC